*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
THE COURT EN BANC[1]
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Danielle E. DEREMER**
Private First Class (E-2), U.S. Marine Corps
*Appellant*

**No. 202300205**

_____

Decided: 7 February 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Benjamin A. Robles

Sentence adjudged 27 April 2023 by a special court-martial convened at Marine Corps Recruit Depot, Parris Island, South Carolina, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1 and a bad-conduct discharge.

For Appellant:
*Lieutenant Raymond E. Bilter, JAGC, USN*

---

[1] Judge de Groot and Judge Gannon took no part in the consideration or decision of this case. Judge Mizer completed his review and his decision prior to initiating terminal leave.

For Appellee:
*Major Candace G. White, USMC*

Amici Curiae in Support of Appellant:
*Marine Corps Victims' Legal Counsel Organization and Navy Victims' Legal
Counsel Program (on brief)*
*Lieutenant Colonel Stacy M. Allen, USMC (argued)*

Amicus Curiae in Support of Neither Party:
*Boston University School of Law's Legislative Policy and Drafting Clinic*

Senior Judge KIRKBY delivered the judgment of the Court and delivered an opinion, in which Senior Judge KISOR, Senior Judge DALY, and Judge MIZER joined. Senior Judge KISOR filed a separate concurring opinion. Judge GROSS filed a separate opinion concurring in the judgment. Chief Judge HOLIFIELD and Judge HARRELL filed separate opinions concurring in part and dissenting in part.[2]

———————————————

**PUBLISHED OPINION OF THE COURT**

———————————————

KIRKBY, Senior Judge:

Congress enacted a law to provide alleged victims of sexual assault in the military with specially trained counsel to assist them through every phase of the military justice proceeding. In this case Naval Criminal Investigative Service [NCIS] agents failed to abide by that law and the associated departmental and service regulations when they interviewed Appellant without her assigned attorney present. While the statutes at issue here do not provide a specific remedy for such violation, we find congressional intent to be clear and therefore find error in the military judge's decision to admit Appellant's statements to NCIS made in her second interview.

———————————

[2] Oral argument was held at Boston University School of Law as part of the Court's outreach program. The Court is grateful for the assistance of the Law School in organizing and facilitating this evolution. An Amicus Curiae Brief was filed by Professor Sean Kealy, Director, Legislative Policy and Drafting Clinic at Boston University School of Law.

Appellant was convicted, contrary to her pleas, of one specification of malingering and one specification of false official statement in violation of Articles 83 and 107, Uniform Code of Military Justice [UCMJ].[3]

Appellant raises three assignments of error [AOE] which we summarize as follows: (1) Did the military judge abuse his discretion by not suppressing Appellant's statement to NCIS during her second interview? (2) Did the Government violate Appellant's speedy trial rights under Article 10 and the Sixth Amendment? And (3) Did the Government violate Appellant's due process right to freedom from arbitrary restraint and detention?[4] We find merit in Appellant's first AOE and take action in our decretal paragraph.

## I. BACKGROUND

In November 2021, Appellant, who was conducting entry level training at Marine Corps boot camp, reported to NCIS Special Agent [SA] Peters that she had been sexually abused and harassed.[5] In the presence of her Victims' Legal Counsel [VLC][6] and Uniformed Victim Advocate [UVA], she described numerous instances of unwanted sexual touching by Private First-Class [PFC] Hotel.[7] At the end of this first interview SA Peters told her, "I may reach out to you again, it's not likely. But what I'll do is I'll go through your VLC. . . and he'll reach out to you."[8]

After conducting an investigation, which involved interviewing eight witnesses, including PFC Hotel, Special Agent Peters determined the allegations

---

[3] 10 U.S.C. §§ 883, 907.

[4] Two months after her second interview with NCIS, Appellant was moved to the Recruit Separation Platoon [RSP]. The RSP is described as a low stress environment for recruits who, for one reason or another, have failed to adapt to the Marine Corps and are being processed out. Appellant spent 365 days attached to the RSP, giving rise to her second and third AOE before this Court. We have reviewed Appellant's second and third AOE and find them to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert denied*, 485 U.S. 968 (1988).

[5] At that time Appellant was assigned to the Female Readiness Platoon – designed to rehabilitate and retrain recruits before returning them to the training pipeline.

[6] Victims' Legal Counsel is the term used in the United States Marine Corps for special victim counsel. *See* Marine Corps Order 5800.16, *Legal Support and Administration Manual*, para. 010305 of Vol. 4 (Jul. 14, 2021).

[7] All names other than those of counsel and the military judge are pseudonyms.

[8] App. Ex. XII.

by Appellant were false.[9] In December 2021, SA Peters closed the investigation regarding PFC Hotel and initiated a second investigation titling Appellant as the subject.[10] In February 2022, without further contact with Appellant's VLC, SA Peters brought Appellant in for a second interview.[11] Special Agent Peters testified that: "it's NCIS policy that if the case agent develops probable cause that the victim lied, then we are to close that investigation and open a perjury case against the previous victim as a subject, in which case she is no longer treated as a victim."[12] Appellant was advised of her rights in accordance with Article 31(b), UCMJ, and Military Rule of Evidence [Mil. R. Evid.] 305, which she waived. Appellant then made incriminatory statements.

At trial, Appellant moved to suppress the statements under several theories relating to lack of voluntariness. These Fifth Amendment claims included her own compliant characteristics, the conditions of the interrogation and law enforcement's agents conduct, and encompassed the denial of her right to have her VLC present.[13] The military judge denied her motion but issued findings of fact and conclusions of law focused on the question of voluntariness and did not address the VLC issue as a claimed basis for suppression.[14]

The parties agreed that Appellant was represented by Captain (Capt) Victor, a VLC, from November 2021 through July 2022. Additional facts necessary to resolve Appellant's AOE are discussed below.

## II. DISCUSSION

### A. Law

Appellant asserts in her first AOE that the military judge erred by admitting her involuntary confession into evidence. We review a military judge's decision to deny a motion to suppress evidence – like other decisions to admit or exclude evidence – for an abuse of discretion.[15] An abuse of discretion occurs

---

[9] App. Ex. III.

[10] App. Ex. III.

[11] On 9 February VLC contacted NCIS to inquire about the status of the case. Appellee's Resp. to Court Order App'x (A).

[12] R. at 717.

[13] App. Ex. XI.

[14] R. at 137-141.

[15] *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995).

when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law.[16] A military judge may also abuse his discretion if he fails to consider important facts.[17] We review de novo any legal conclusions supporting the suppression ruling.[18] Further, the abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range.[19] Where the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted. On the contrary, if a military judge fails to place his findings and analysis on the record, less deference will be afforded.[20]

A confession is involuntary, and thus inadmissible, if it was obtained "in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement."[21] The prosecution bears the burden of establishing by a preponderance of the evidence that the confession was voluntary.[22] The voluntariness of a confession is a question of law that we review de novo.[23]

The Fifth Amendment to the Constitution provides, in part, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."[24] Congress has primary responsibility for the delicate task of balancing

---

[16] *United States v. Mott*, 72 M.J. 319, 329 (C.A.A.F. 2013) (quoting *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)).

[17] *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citing *United States v. Solomon*, 72 M.J. 176, 180-81 (C.A.A.F. 2013)).

[18] *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citations omitted).

[19] *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citing *United States v. Wallace*, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)).

[20] *United States v. Finch*, 79 M.J. 389, 397 (C.A.A.F. 2020) (quoting *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014)).

[21] Mil. R. Evid. 304(a)(1)(A); *see also* Article 31(d), UCMJ, 10 U.S.C. § 831(d).

[22] *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996) (citing M.R.E. 304(e); *United States v. D.F.*, 63 F.3d 671, 679 (7th Cir. 1995)).

[23] *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *see also United States v. Bresnahan*, 62 M.J. 137, 141 (C.A.A.F. 2005) ("Whether a confession is voluntary is a question of law we will review de novo.").

[24] U.S. Const. amend. V.

the rights of servicemembers against the needs of the military,[25] subject to the requirements of the Due Process Clause.[26] In determining what process is due, courts must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces.[27]

Title 10 U.S.C. § 1044e [Section 1044e] designates legal counsel for the purpose of providing legal assistance to specific individuals who are the victims of an alleged sex-related offense.[28] Subsection (b) of Section 1044e states that legal assistance authorized by the statute includes "[r]epresenting the victim at any proceeding in connection with the reporting, military investigation, and military prosecution of the alleged sex-related offense."[29] Subsection (e) assigns administrative responsibility in part as follows:

> (1) Consistent with the regulations prescribed under subsection (i), the Judge Advocate General . . . under the jurisdiction of the Secretary concerned, and within the Marine Corps the Staff Judge Advocate to the Commandant of the Marine Corps, is responsible for the establishment and supervision of individuals designated as Special Victims' Counsel.[30]

Additionally, 10 U.S.C. §1565b, was then amended to provide in part:

> [N]otice of the availability of a Special Victims' Counsel under section 1044e of this title [10 USCS § 1044e] shall be provided to a member of the armed forces or dependent who is the victim of sexual assault before any military criminal investigator or trial counsel interviews, or requests any statement from, the member or dependent regarding the alleged sexual assault.

---

[25] *Solorio v. United States*, 483 U.S. 435, 447 (1987) (citing *Burns v. Wilson*, 346 U.S. 137, 140 (1953)).

[26] *Weiss v. United States*, 510 U.S. 163, 176–77 (1994) (citations omitted).

[27] *Id.* (citation omitted) (internal quotation marks omitted); *see also United States v. Anderson*, 83 M.J. 291, 298 (C.A.A.F. 2023) ("When Congress acts pursuant to its power to make Rules for the Government and Regulation of the land and naval Forces, judicial deference is at its apogee.") (citations omitted) (internal quotation marks omitted).

[28] 10 U.S.C. §1044e.

[29] 10 U.S.C. § 1044e(b).

[30] 10 U.S.C. § 1044e(e).

At the departmental level, in conformity to applicable statutes and Department of Defense policy, Department of Defense Instruction 5505.18 [DoDI 5505.18] was promulgated. It provides in relevant part: "[o]nce a victim is represented by. . . VLC. . . further communication with the victim will be coordinated through the assigned. . . VLC. . . ."[31] The stated policy of DoDI 5505.18 is that military criminal investigative organizations (e.g. NCIS) "will initiate a criminal investigation in response to all allegations of adult sexual assault. . . ."[32] The instruction defines law enforcement victim as "[a] Service member or civilian [law enforcement] person who reports or discloses."[33]

A "Victim" in the context of Mil. R. Evid. 514 is defined as any person who is alleged to have suffered direct physical or emotional harm as the result of a sexual or violent offense. Subsection (h) of Section 1044e defines "Alleged sex-related offense" as any allegation of:

> (1) a violation of section 920, 920b, 920c, or 930 of this title (article 120, 120b, 120c, or 130 of the Uniform Code of Military Justice) [10 USCS § 920, 920b, 920c, or 930]; or

> (2) an attempt to commit an offense specified in a paragraph (1) as punishable under section 880 of this title (article 80 of the Uniform Code of Military Justice) [10 USCS § 880].

And, at the service level, Marine Corps Order 5800.16 [LSAM] mandates that:

> [C]ommunication with represented victims related to the subject of representation requires notice to the detailed VLC, unless otherwise authorized by law or court order. This requirement includes requests to interview the victim by trial counsel, defense counsel, or any person acting on behalf of trial or defense counsel, and criminal investigators.[34]

---

[31] Dep't of Def. Instr. 5505.18, *Investigation of Adult Sexual Assault in the Department of Defense*, (March 22, 2017) [DoDI 5505.18].

[32] DoDI 5505.18, Section 3.1.

[33] DoDI 5505.18, Glossary at 25.

[34] Marine Corps Order 5800.16, *Legal Support and Administration Manual*, Volume 4, para 010604 (Aug 26, 2021) [LSAM].

**B. Analysis**

> *1. Appellant, as an alleged victim, was entitled to VLC representation at every proceeding relating to her allegation, including the second NCIS interview.*

Appellant is "an individual described in" the statutory scheme of Section 1044e in that she was eligible for military legal assistance under 10 U.S.C. § 1044. The initial allegations made by Appellant were that she had been touched on the breasts and buttocks by PFC Hotel and had been forced to touch the breasts and buttocks of PFC Hotel. These allegations amounted to sexual contact in violation of Article 120, UCMJ, and fall squarely within the definition of sex-related offense as addressed by Section 1044e.[35] A VLC was properly detailed in accordance with the LSAM.[36] The parties do not dispute that at the time of the second interview Appellant was represented by VLC.[37]

Congress, the Department of Defense, and the Marine Corps established rights to victims of sexual assault and SA Peters was bound to adhere to each established right, irrespective of source. While we agree with Judge GROSS that SA Peters was bound by DoDI 5505.18 and the LSAM, we disagree with his reliance on them alone. In our view, Section 1044e establishes the most clear and enforceable right.[38]

The charges leveled against Appellant in this case related to the report she made to NCIS in November 2021 and was the basis for her being assigned VLC.[39] The Government suggests the two interviews, the first in which Appellant is titled as a victim and the second when she is titled as a subject, are separate; we reject this proposition. Each and every statement within the charge sheet that the Government identified as a false official statement originated with and was uttered during Appellant's initial interview. It is impossible, as a matter of common sense, to disentangle the allegation of sexual assault from the statements made during the announcement of that allegation.

---

[35] 10 U.S.C. § 920.

[36] Appellee's Resp. to Court Order, App'x A.

[37] R. at 8.

[38] We have considered similar cases including *U.S. v. Caceres*, 440 U.S. 741 (1979), and *United States v. Kohut*, 44 M.J. 245 (1996). We distinguish those that relate to regulatory rules or agency procedures. Here, Congress designed the statute to protect a victim's right, a difference that we believe mandates our analysis rather than that of Judge GROSS in his concurrence.

[39] App. Ex. VIII; *see also* charge sheet.

Additionally, while Appellant was titled as a victim by NCIS during the first interview and as a suspect in the second interview, this is of no import.[40] Nowhere in either the statutes or the other instructions and orders related to this issue is law enforcement titling of an individual dispositive or even mentioned. Moreover, the NCIS "policy" of determining when an alleged victim is no longer entitled to VLC representation has no foundation in law and is contrary to the letter and intent of Section 1044e and the various instructions that flow therefrom.

In *United States v. McOmber*, the Court of Military Appeals (CMA) held that:

> [O]nce an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(b) of the Uniform Code. This includes questioning with regard to the accused's future desires with respect to counsel as well as his right to remain silent, for a lawyer's counseling on these two matters in many instances may be the most important advice ever given his client. To permit an investigator, through whatever device, to persuade the accused to forfeit the assistance of his appointed attorney outside the presence of counsel would utterly defeat the congressional purpose of assuring military defendants effective legal representation without expense.[41]

The *McOmber* rule was based on the CMA's interpretation of the right to counsel at the time. Following two Supreme Court decisions[42] the Military Rules of Evidence were amended, and in *United States v. Finch, McOmber* was overruled because its constitutional basis was no longer good law and the Court of Appeals for the Armed Forces [CAAF] established that Mil. R. Evid. 305

---

[40] Titling is the method by which NCIS identifies persons within an investigation. *See* Dep't of Def. Instr. 5505.07, *Titling and Indexing by DoD Law Enforcement Activities*, section 1.2 (August 8, 2023).

[41] *United States v. McOmber*, 1 M.J. 380, 383 (C.M.A. 1976) (citing 10 U.S.C. § 827) *overruled by United States v. Finch*, 64 M.J. 118, 124 (C.A.A.F. 2006).

[42] *Minnick v. Mississippi*, 498 U.S. 146 (1990); *McNeil v. Wisconsin*, 501 U.S. 171 (1991).

governed.[43] Section 1044e and 10 U.S.C. § 1565b along with the accompanying DoDI and, in this case, the LSAM are congressional, departmental and service efforts to afford specific (and in some cases different or greater) rights to those in, or related to, the military who report that they are victims sexual assault.[44]

In *Finch*, the CAAF expressed that "a change in a rule cannot supplant a statute"[45] The *Finch* Court pointed out that "*McOmber* represented an attempt to ensure that the statutory right to counsel under Article 27, UCMJ, was administered in a manner consistent with then-current Supreme Court constitutional precedent regarding the right to counsel."[46] Here, unlike in *Finch*, the underlying rationale is entirely military. Section 1044e was written by Congress to help combat the specific issue of sexual assault in the military.[47] This meets the very *distinct military rationale* that was absent in *McOmber* and that would have justified its application. It is axiomatic that as much as "a change in a rule cannot supplant a statute," the absence of a change cannot supplant a new statute. We must therefore conclude that Section 1044e and its implementing rules and regulations are not eviscerated by strict application of Mil. R. Evid. 305, which has never been changed to account for the VLC program.

Section 1044e can only be viewed as Congress exercising its obligations to balance the rights of servicemembers against the needs of the military. Congress determined that military victims, as defined, should be afforded a right to counsel different from others within the military justice system, at every proceeding.[48] It is beyond question that Congress has plenary authority to

---

[43] 64 M.J. at 124.

[44] Brief for Boston University School of Law's Legislative Policy and Drafting Clinic as Amicus Curiae in Support of Neither Party.

[45] *Finch*, 64 M.J. at 124.

[46] *Id.*

[47] The preamble to the Manual for Courts-Martial states in part: "The military operates a modern criminal justice system that recognizes and protects the rights of both the victims of alleged offenses and those accused of offenses. The continuous evolution of the military justice system has progressed through statutes, Executive Orders, regulations, and judicial interpretations." *See Manual for Courts-Martial, United States* (2019 ed.) pt. I, at I-1.

[48] *See generally* Brief for Marine Corps Victims' Legal Counsel Organization and Navy Victims' Legal Counsel Program as Amici Curiae in Support of Appellant.

"raise and support Armies" and to "provide and maintain a Navy."[49] Congress also has plenary authority to "make Rules for the Government and Regulation of the land and naval Forces."[50] Section 1044e therefore amounts to an articulation of what process is due, consistent with the Fifth Amendment, to victims of alleged sexual assault in the military.

The record before us is devoid of any conclusions of law relating to Appellant's claim in her motion to suppress that "NCIS [agents] should not have interviewed [Appellant] without [VLC] present." We are left therefore, without a basis on which to rest deference to the military judge on this issue. An abuse of discretion occurs if the trial court's decision is influenced by an erroneous view of the law; and in the absence of such a decision we must make our own determination.

We therefore hold that, in clear conformity with congressional intent: once an individual, subject to the Code, knows, or reasonably should know, that an alleged victim is represented by an attorney pursuant to Section 1044e, questioning of that alleged victim, about related matters, without affording the counsel reasonable opportunity to be present is a due process violation, and renders any statement obtained involuntary under Mil. R. Evid. 304. This includes questioning with regard to the alleged victim's future desires with respect to counsel as well as the right to remain silent, for a lawyer's counseling on these two matters in many instances may be the most important advice ever given a client. To permit, through whatever device, an agent of the government to persuade the alleged victim, regardless of how she is titled, to forfeit the assistance of an appointed attorney outside the presence of that counsel would utterly defeat the obvious congressional purpose of assuring military victims of sexual assault effective legal representation.

*2. The NCIS Special Agent knowingly violated Appellant's right to representation of her detailed VLC.*

In this case, SA Peters knew specifically that Appellant was represented by Capt Victor.[51] Special Agent Peters had initially interviewed Appellant with Capt Victor present and had told Appellant that if he needed to speak to her again he would "go through your VLC . . . and he'll reach out to you."[52] During his testimony, SA Peters stated that it was "NCIS policy that if the case agent

---

[49] U.S. Const. art. I, § 8, cls. 12–13.

[50] U.S. Const. art. I, § 8, cl. 14.

[51] R. at 700.

[52] App. Ex. XII.

develops probable cause that the victim lied, then we are to close that investigation and open a perjury case against the previous victim as a subject, in which case she is no longer treated as a victim."[53]

We find no authority for such unilateral action by NCIS or its agents. Where Congress, the Department of Defense and the Marine Corps intended VLC participation as a buffer to aid alleged victims, law enforcement cannot simply ignore it. While the concurrence rightly points out that Department of Defense policy and Marine Corps Orders prohibited the very actions SA Peters undertook in this case, we believe that congressional intent should also be effectuated and so decline to limit the scope of our position. Therefore, the military judge abused his discretion in denying the Defense motion to suppress Appellant's second interview with NCIS.

Any questioning, on matters related to Appellant's allegation as a victim, without affording Capt Victor an opportunity to be present, were in direct conflict with Section 1044e and the associated department and service regulations. We disagree with the dissent's proposition regarding the effect of Appellant's waiver of rights. Section 1044e provides different rights to an alleged victim, and the talismanic recitation of Article 31(b) and/or Mil. R. Evid. 305 is not sufficient in these cases.[54]

## C. Analysis of Prejudice.

We now consider the impact on the findings and sentence after determining that Appellant's statements during her second interview should have been suppressed. The evidence presented by the Government as to the false official statement charge was based extensively on the statements obtained in violation of Appellant's rights – that is Prosecution Exhibit 1, and the testimony of SA Peters related to 16 February 2022. Suppression of that evidence eviscerates the Government's case as to the false official statement and we are left with no doubt that the charge must be set aside.

Conversely, the statements made by Appellant in her second interview related to her use of a wheelchair and the malingering charge were minimal in comparison to the evidence presented. At trial, the Government presented compelling and overwhelming medical documentation and testimony, including from medical experts, staff and lay observers, that proved beyond a reasonable doubt each and every element of the Article 83 violation. We are convinced,

---

[53] R. at 717.

[54] 10 U.S.C. § 1044e.

beyond a reasonable doubt, even in the absence of Prosecution Exhibit 1, and SA Peters's testimony regarding his interview with Appellant on 16 February 2022, Appellant would have been convicted of that charge.[55] In the absence of the evidence that should have been suppressed, the testimony of medical personnel and independent lay witnesses was sufficient to obtain and sustain a conviction on the malingering charge.

The maximum punishment for each offense charged was the jurisdictional maximum for the special court-martial at which Appellant was tried. Given the sentence awarded – a bad-conduct discharge and reduction to pay-grade E-1 – and having considered the sentence reassessment factors set out in *United States v. Winckelmann*, we are unable to fairly reassess Appellant's sentence.[56] While the sentencing landscape change that accompanies our decision may not be as dramatic as other cases, there is a significant question as to whether the nature of the remaining offense captures the gravamen of the original charges.

## III. CONCLUSION

After careful consideration of the record, as well as the briefs of appellate counsel, and amici curiae, the finding of guilty as to **CHARGE I** is **AFFIRMED**; the finding of guilty as to **Charge II** is **SET ASIDE;** and, the sentence is **SET ASIDE.** A rehearing is **AUTHORIZED**.

---

[55] Pros. Ex. 1 is the videotape recording of Appellant's 16 February 2022, NCIS interview.

[56] 73 M.J. 11, 15–16 (C.A.A.F 2013).

KISOR, S.J. (concurring):

I concur in the majority's Opinion in its entirety.[1] I also agree with Judge GROSS's well-reasoned concurrence analyzing the regulatory violation that occurred in this case, and the ramification thereof. I write separately to emphasize that I do not believe that it is unwise or inadvisable for the Court to reach the obvious constitutional violation under these facts.

---

[1] I also echo the Court's gratitude to Boston University School of Law which hosted this oral argument as part of the NMCCA outreach program. Professor Sean Kealy, Director, Legislative Policy and Drafting Clinic at Boston University School of Law, filed an excellent Amicus Curiae Brief.

Major Candace White, USMC, Lieutenant Raymond Bilter, JAGC, USN, and Lieutenant Colonel Stacy Allen, USMC, (Chief Victims' Legal Counsel of the Marine Corps, appearing as amicus) provided truly professional oral arguments to supplement their briefs, which were of the highest quality.

GROSS, J. (concurring):

I concur in the majority's decision regarding Appellant's second and third AOE and join that part of the opinion of the En Banc Court in its entirety. I also agree with the majority that because Appellant's statement to Special Agent Peters in February 2022 must be suppressed, the appropriate remedy is to set aside the sentence and findings only for Charge II. Finally, I agree that that the evidence against Appellant regarding Charge I was overwhelming and the admission of Appellant's confession was harmless beyond a reasonable doubt for that offense. However, I write separately because I do not believe that this Court must make a determination as to whether Appellant's constitutional or statutory rights were violated in order to reach this conclusion.

I would instead decide this matter based solely on the unauthorized actions of the agents of the Naval Criminal Investigative Service [NCIS] who used deception and artifice to separate Appellant from her duly assigned Victims' Legal Counsel [VLC] in knowing violation of the instructions of the Department of Defense and the Marine Corps. Because the uncontroverted facts show that agents of NCIS willfully violated Appellant's regulatory right to counsel, I would preclude the Government from profiting from its agents' misconduct and find that the military judge abused his discretion in not suppressing the interrogation of 16 February 2022.

In November 2021, Appellant reported to Special Agent Peters that she had been sexually assaulted by PFC Hotel. This interview was conducted in the presence of Appellant's VLC and Uniformed Victim Advocate. Special Agent Peters then interviewed a number of people. Special Agent Peters decided based on these interviews that he did not believe that Appellant was telling him the truth in her claims of sexual assault. He then unilaterally decided to interrogate her without first telling her VLC in rather flagrant violation of the Department of Defense Instruction regarding the VLC program.

At trial SA Peters testified that he knew that Appellant was represented by VLC at the time that he decided to conduct her second interview.[1] In spite of this knowledge, he relied upon an unspecified NCIS "policy" that he claimed directed "that if the case agent develops probable cause that the victim lied, then we are to close that investigation and open a perjury case against the previous victim as a subject, in which case she is no longer treated as a victim."[2]

---

[1] R. at 716.

[2] R. at 717. Government counsel at Oral Argument cited to no such policy and agreed that there is no evidence of a policy other than the statements of the NCIS

Likewise, when Appellant's VLC emailed another agent in an attempt to ascertain why Appellant was interviewed about her allegations without prior notice through counsel, Special Agent Bravo replied that Appellant "was interviewed as a subject under a [Case Control Number] different from the case wherein you were assigned as her VLC. As such [Appellant] had no right to have a VLC present as a VLC is only offered to certain victims of crime."[3]

The Secretary of Defense implemented an alleged sexual assault victim's rights under 10 U.S.C. § 1044e [Section 1044e] and 10 U.S.C. § 1565(b) in part through the issuance of Department of Defense Instruction 5505.18 [DoDI 5505.18].[4] Paragraph 3.1.b.2 of DoDI 5505.18 explicitly states, "[o]nce a victim is represented by an SVC, VLC, or VC, further communications with the victim will be coordinated through the assigned SVC, VLC, or VC." While the term victim is not plainly defined, the instruction does provide for a restricted reporting option for victims who have personal conversations with a law enforcement person – called an LE Victim – and defines an LE Victim as "[a] Service member or civilian LE person who reports or discloses that they are a victim of a sexual assault." The definition of victim is therefore incredibly broad under the DoDI, and nowhere does the instruction seem to indicate that law enforcement can make any independent determination as to whether a victim is entitled to VLC services.

The Marine Corps provides further guidance on the VLC program in Marine Corps Order 5800.16-V4, Legal Support and Administration Manual [LSAM]. The LSAM provides for the complete independence of Victims' Counsel.[5] The LSAM also mirrors DoDI 5505.18, stating, "Communication with represented victims related to the subject of representation requires notice to the detailed VLC, unless otherwise authorized by law or court order. This require-

---

agents present in the record. Nor did the Government ask this Court to take Judicial Notice of any further authority consistent with its position. And to the extent that the Government would rely on a different policy to remove protections that the DODI and MCO offer an alleged victim, the Government would need to prove that such a policy exists and is authorized.

[3] Appellee's Response to Court Order to produce Victim's Legal Counsel Declaration, App'x B.

[4] Dep't of Def. Instr. 5505.18, *Investigation of Adult Sexual Assault in the Department of Defense*, (March 22, 2017) [DoDI 5505.18].

[5] LSAM, para 010205 ("The VLCO and VLC shall be independent and free from unlawful pressure or influence in the execution of their duties.").

ment includes requests to interview the victim by trial counsel, defense counsel, or any person acting on behalf of trial or defense counsel, *and criminal investigators*."[6] Most importantly, and fatal to the Government's rather untenable position, the LSAM specifically contradicts the position of both special agents, stating: "[n]o external entity may make an eligibility determination on behalf of the VLCO."[7]

The Court of Appeals for the Armed Forces [CAAF] has repeatedly held that "[i]t is well-settled that a government agency must abide by its own rules and regulations where the underlying purpose of such regulations is the protection of personal liberties or interests."[8] This tenet of agency law has been used by military courts to justify drastic judicial remedies in cases where the Government did not comply with its own rules. Most notably, the Court of Military Appeals [CMA] held in *United States v. Russo*, that a recruiter's lies and falsification of the accused's enlistment papers rendered the accused's enlistment invalid under Department of Defense regulations and therefore deprived the Government of jurisdiction under Article 2, UCMJ, as it existed at the time.[9]

In *United States v. Dillard*, the CMA, in a short per curiam opinion, reversed an accused's conviction because evidence had been seized in violation of a local order that required search authorizations to be issued in writing.[10] Judge Cook dissented, arguing that the search would have been valid under the Fourth Amendment.[11]

Judge Cook observed that a good faith reliance by police was at least a factor in the Supreme Court's decision in *United States v. Caceres* where the Court declined to apply the exclusionary rule when agents of the Internal Revenue Service neglected to follow a Department of Justice requirement to obtain authorization before engaging in surreptitious recording of an interview of the

---

[6] LSAM, para 010604 (emphasis added).

[7] LSAM, para 010403.

[8] *United States v. Dillard*, 8 M.J. 213, 213 (C.M.A. 1980) (quotations and citations omitted). *See also United States v. Williams*, 68 M.J. 252, 256 (C.A.A.F. 2010) (citation omitted).

[9] *United States v. Russo*, 1 M.J. 134, 135 (C.M.A. 1975). Congress amended Article 2 as a direct result of the CMA's decision in *Russo. United States v. Boyett*, 42 M.J. 150, n. 4 (C.A.A.F. 1995).

[10] *Dillard*, 8 M.J. 213.

[11] *Id.* at 214–15. (Cook, J. dissenting).

defendant.[12] In *Caceres* the Supreme Court noted that the regulation in question was not designed for the benefit of the defendant tax payer but was rather designed to regulate internal agency conduct.[13] However, in *Yellin v. United States*, the Supreme Court overturned the defendant's conviction because the congressional committee that sought to take his statement, did not follow its internal rules.[14] The Court found that the rules of the committee were specifically designed to protect the rights of individuals appearing before it.[15]

Here, there is simply no question that NCIS agents blatantly violated both DoDI 5505.18 and the LSAM in two ways. First, in violation of both orders, Special Agent Peters interviewed Appellant about her claim of abusive sexual contact without coordination through, or notice to, Appellant's VLC. There can be no doubt that Appellant's interrogation in February was related to her claim of abusive sexual contact. While Special Agent Peters also questioned Appellant regarding her alleged malingering, the main focus of his questioning related to Appellant's first interview and her claims of sexual abuse. And, most telling, all of the false official statements that Appellant was charged with, which Appellant admitted in February were false, were made at her first interview.

Second, NCIS agents violated a Marine Corps Order by explicitly making an eligibility determination. This is evidenced by Special Agent Bravo's email explaining that "VLC is only offered to certain victims of certain crimes." While the phrase is technically correct, it was her interpretation of the regulations—that because NCIS agents themselves had determined Appellant's claim was false the agents could forgo the rights afforded Appellant by regulation—that was decidedly incorrect.

Having determined that agents of the Government consciously and deliberately violated Appellant's right to have all communications go through her VLC and to have her VLC determine her eligibility for continued services, I would find that binding precedent from our superior Court instructs that suppression of Appellant's second statement is required in this case. This is driven by the fact that I would find that the instructions in question here are clearly designed to protect the rights of alleged victims of sexual assault, and as a result, there must be a judicial remedy for the NCIS agents' violations. As the

---

[12] *Id.* (citing *United States v. Caceres*, 440 U.S. 741 (1979)).

[13] *Caceres*, 440 U.S. at 760.

[14] 374 U.S. 109, 118 (1963).

[15] *Id.* at 123.

CAAF has stated, "excluding evidence from a court-martial to remedy a regulatory violation may be appropriate if the alleged violation implicated constitutional or statutory rights."[16]

Here, the purpose of DoDI 5505.18 and the LSAM was to implement statutes conferring upon victims of certain offenses greater rights than such victims previously had. The reason for the rights Congress established in implementing statutes like Section 1044e and 10 U.S.C. § 1565(b) are ably put forth in the briefs of *amici curiae*, and stemmed from Congress's determination that there was an ignominious history of military law enforcement and legal professionals mistreating victims in the military justice system.

These rights included the right to have access to an attorney client relationship with a judge advocate who could advise them of their rights and represent them throughout the reporting, investigation and prosecution of their allegations. In implementing these rights both the Secretary of Defense and the Commandant of the Marine Corps made a policy decision that to enforce those rights, all persons questioning a victim about the substance of their alleged sexual assault must go through appointed counsel. The actions of Special Agents Peters and Bravo therefore violated the personal regulatory rights of Appellant.

Resolving, as the majority does, Appellant's AOE by finding that Congress, in an unheralded act of legislative necromancy, resurrected the CAAF's decision in *McOmber* is, in my mind, an unnecessary step under the doctrine of constitutional avoidance. "It is a long-established principle that federal courts will avoid a constitutional question if the issue presented in a case may be adjudicated on a non-constitutional ground."[17]

While the dissents in this case make strong points, particularly with respect to the statutory scheme involved and cause me to be dubious of the majority's reasoning, I simply cannot ignore the regulatory aspect of Appellant's rights. Nor do I think that we can cobble together a "Schrödinger's confession" in which the NCIS agents' actions in bringing Appellant into the room without going through her counsel were both unlawful with respect to her as a victim and lawful with respect to her as a suspect given the clarity of the regulations involved. It is no leap to conclude that Special Agents Peters and Bravo vio-

---

[16] *United States v. Guzman*, 52 M.J. 318, 320–21 (C.A.A.F. 2000) (citation omitted).

[17] *United States v. Mangahas*, 77 M.J. 220, 221–22 (C.A.A.F. 2018) (citing *United States v. Serianne*, 69 M.J. 8, 10-11 (C.A.A.F. 2010)).

lated the regulations because they knew that if they went through VLC, Appellant would never have been in that room without an attorney to advise her that she ought to remain silent.

The solution I put forth here also resolves, at least to my mind, the concerns raised by Chief Judge HOLIFIELD of whether suppression would be necessary when a non-government actor (i.e. defense counsel) violates a victim's rights under the applicable order. Obviously, it would not be. Instead, relying on the CAAF's precedent dictating that the *Government* is bound to obey those regulations set forth for the protection of the personal liberties or interests of alleged victims, provides an easy vehicle to repudiate the wrongdoing of the NCIS agents and vindicate the rights of Appellant without engaging in judicial rule making. Here, I would find that nothing more than the mandate of *Russo* and *Dillard* compels us to divest the Government of its ill-gotten evidence resulting from a clear violation of its own regulations.

HOLIFIELD, C.J. (concurring and dissenting in part):

I agree with my fellow judges that Special Agent (SA) Peter's reengaging with Appellant without providing notice to her victims' legal counsel (VLC) constituted a violation of the statute. But I part ways with the majority as to whether this violation rendered her second statement to SA Peters involuntary for purposes of Mil. R. Evid. 304. I also disagree with the majority's chosen remedy.[1]

## A. The Violation

"Involuntary statement" is defined in Mil. R. Evid. 304(a)(1)(A) as "a statement obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." The majority looks to a "violation of the . . . Due Process Clause of the Fifth Amendment" as the basis for finding Appellant's second statement involuntary.[2]

Even if Appellant's second statement was taken in violation of Section 1044e and its related implementing regulations, any due process owed thereunder was based on her status as an alleged victim—not as an accused. As an *accused*, Appellant may have been entitled to the protections enumerated in Mil. R. Evid. 305. And she did receive the warnings and protections due a criminal accused. (In fact, given that Appellant was neither in custody nor the subject of preferred charges at the time of the second interview, SA Peters's rights advisement went beyond that required by Mil. R. Evid. 305). Appellant waived these rights and nobody argues otherwise.

Any violation of those rights discussed in Mil. R. Evid. 305 may have rendered her statement involuntary in the context of a criminal prosecution. Appellant and the majority, however, seek something more, conflating being prosecuted with making a claim of sexual assault. But in applying a criminal law analysis to a non-criminal law issue, the Court elevates the protections given to an alleged victim to be equal (or exceed) those enjoyed by criminal defendants facing conviction and punishment. This is quite a leap in terms of logic and law.

---

[1] I concur with the majority's resolution to Appellant's second and third AOE.

[2] *Ante* at 5-6.

**B. The Remedy**

Even if SA Peters did violate Section 1044e, nowhere in the text of the statute—itself wholly outside the UMCJ—is there a remedy for violations, either petty or significant. In the absence of clear statutory language, the appropriate remedy for such a violation rests with the appropriate rule-making authority.[3]

Instead, the majority fashions its own remedy, drawing inspiration from the general exclusionary rule found in Mil. R. Evid. 304(a) (via Mil. R. Evid 305(a)). I disagree with this approach. But if this Court is to create a remedy of exclusion of evidence—one found not in the relevant statute, but only by analogy to a debatably related rule of evidence—we should at least apply the same balancing test found in the judicially-created exclusionary rule applicable to illegal searches. That is, before we exclude Appellant's incriminating statement to SA Peters, we should balance any appreciable deterrence of future violations against the costs to the justice system.

The interplay between the right to a VLC under Section 1044e and the right to counsel described in Mil. R. Evid. 305 is a matter of first impression for this Court and our sister Courts of Criminal Appeals. Until today, military law enforcement was without clear legal guidance as to how Section 1044e applied in cases such as this, i.e., where an alleged victim of sexual assault is later suspected of making a false official statement regarding that same allegation of sexual assault. In the absence of such guidance, NCIS—apparently focused on the distinction between the terms "victim" and "suspect"—adopted the "policy"

---

[3] *See United States v. Custis*, 65 M.J. 366, 371 (C.A.A.F. 2007) (holding that within the military justice system, "it is for the policymaking branches of government to weigh the utility of the marital communications privilege against the truth-seeking functions of the court-martial and, if appropriate, make adjustments" accordingly); *see also United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003) (whether an evidentiary privilege should apply "is a legal policy question best addressed by the political and policy-making elements of the government") *superseded by statute as recognized by United States v. Slape*, 76 M.J. 501 (A.F. Ct. Crim. App. 2016); *United States v. Rodriguez*, 54 M.J. 156, 157–61 (C.A.A.F. 2000) (rejecting proposition that the psychotherapist-patient privilege in *Jaffee v. Redmond*, 518 U.S. 1 (1996), applies to courts-martial and holding that "the decision as to whether, when, and to what degree *Jaffee* should apply in the military rests with the President, not this Court"); *United States v. Tipton*, 23 M.J. 338, 342–43 (C.M.A. 1987) (recognizing clear difference with regard to evidentiary privileges articulated on a case-by-case basis and rejecting that methodology in favor or a clear rule that provides for "'the certainty and stability necessary for military justice'" (quoting Stephen A. Salzburg et. Al., Military Rules of Evidence Manual 215 (1981))).

applied by SA Peters. Based on the language Congress used in Section 1044e, I do not find the NCIS interpretation to be an unreasonable one.

Here, then, SA Peters applied a not unreasonable policy in the absence of any judicial guidance to the contrary. Penalizing the Government for this has no deterrent value and simply provides a windfall to Appellant. (Of course, the majority's clear guidance on the matter now puts any future violations of this statute in a different light).

Furthermore, if Congress intended criminal courts to enforce the victim-focused rights of Section 1044e by providing remedies in the criminal law context, it would have explicitly said so. This is a reasonable conclusion given that—as with other non-criminal-law rights—enforcement mechanisms already exist. Here these include, inter alia, filing a professional responsibility complaint against counsel who violate representation rules, raising a complaint via the chain of command, or contacting a member of Congress.[4]

Unlike the majority's solution, such remedies are available regardless of whether the violator is an agent of the Government. The VLC notification requirement of Section 1044e and its implementing regulations applies equally to trial counsel, defense counsel and law enforcement agents. But the majority's exclusionary remedy—punishing the Government—would do nothing to deter violations by defense counsel. This remedy is simply a poor (and unnecessary) fit for the problem.

For these reasons, I would affirm the findings and sentence. Accordingly, I respectfully dissent.

---

[4] *See* Judge Advocate General Inst. 5803.1E, *Professional Conduct of Attorneys Practicing Under the Cognizance and Supervision of the Judge Advocate General*, Enclosure 2 (Jan. 20, 2015) (professional responsibility complaint process for covered attorneys); U.S. Navy Regulations, sections 0820c and 1151.1 (Sep. 14, 1990) (establishing the right to request mast for Naval and Marine Corps service-members); *see also* Marine Corps Manual with Changes 1-3, para. 2805 (Mar. 21, 1980) (request mast procedure within the Marine Corps); *see also* 10 U.S.C. § 1034 (protecting service-member's communication with members of Congress); *see also* 10 U.S.C. § 806b(e) (authorizing a victim to seek review by the Court of Criminal Appeals if the victim "believes that a preliminary hearing ruling . . . violates the rights of the victim. . . .").

HARRELL, J. (concurring and dissenting in part):

I join the majority with respect to Appellant's second and third AOE. I part ways on the first AOE. Because the majority conceives of a right to VLC more sacrosanct and immutable than any right to counsel protected by the Constitution, the Uniform Code of Military Justice, or the Military Rules of Evidence, I respectfully dissent.

Appellant had an appointed military lawyer, Appellant was advised of her right to have her appointed military lawyer present, and Appellant waived her right to have her appointed military lawyer present.[1] She thus waived any right she had for her VLC to be present during her second interview with NCIS, as she did with all other rights she had as a *suspect*, and she provided a voluntary statement. That NCIS did not go through her appointed VLC in arranging the interview does not dictate a different outcome. If Appellant's appointed counsel was of the defense variety, we would find ourselves on trodden ground, and we could summarily dispose of the issue with a simple, "*See United States v. Finch.*"[2] But since her appointed counsel was of the VLC variety, the majority finds justification in Section 1044e to breathe new life into *United States v. McOmber*[3] in order to provide Appellant relief. I disagree.

Starting off, it is telling that we are not faced with a claim of deprivation of Appellant's right to representation by her VLC at her court-martial. After all, following Appellant's and the majority's logic, her court-martial was a "proceeding[] in connection with the reporting, military investigation, and military prosecution of the alleged sex-related offense,"[4] which carries with it all of the attendant rights of Section 1044e and implementing regulations. Of course, Appellant chose by whom she wanted to be represented at her court-martial, but why, before the need for the protection of her rights and interests reached

---

[1] App. Ex. XII at 70, 88–91.

[2] 64 M.J. 118 (C.A.A.F. 2006) (overruling the holding of *United States v. McOmber*, 1 M.J. 380, 383 (C.M.A. 1976), "that once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code.").

[3] 1 M.J. 380 (C.M.A. 1976), *overruled by Finch*, 64 M.J. at 124.

[4] 10 U.S.C. § 1044e(b)(6).

its zenith at her court-martial, did her long-serving appointed counsel terminate representation?[5] This is rhetorical, of course, since the answer is obvious: There is a demarcation between VLC and Defense services, one explicitly recognized in Section 1044e.[6] And despite that demarcation *in the letter of the statute*, the majority divines a more compelling, *unstated* congressional intent that Section 1044e creates an enduring cause of action that transcends that demarcation such that when status as a victim gives way to status as an accused, and representation by a VLC gives way to representation by a defense counsel, the latter may seek relief from the infringement of the right to the former. I cannot join the majority in this leap.

Congress has provided certain rights to victims.[7] Congress has also provided avenues of relief from the infringement of certain victim rights.[8] The relief Appellant seeks—the suppression of a statement obtained outside the presence of VLC (irrespective of waiver) if later charged with an offense—is not among them. That relief is absent from both the UCMJ and the statute Appellant claims has been infringed, Section 1044e. We can easily identify a theme: Avenues of relief for violation of *victim rights* are available in proceedings in which the individual is *involved as a victim*, and not as the *accused*.[9]

"When interpreting legislation, we have long presumed two things: that Congress knows the law and that Congress selected the language that it intended to apply."[10] Part of the law that Congress is presumed to have known

---

[5] App. Ex. XIV at 1.

[6] *See* 10 U.S.C. § 1044e(b) ("The types of legal assistance authorized by subsection (a) include the following:

(1) Legal consultation regarding potential criminal liability of the victim stemming from or in relation to the circumstances surrounding the alleged sex-related offense *and the victim's right to seek military defense services*.") (emphasis added).

[7] *See, e.g.,* Article 6b(a), UCMJ; 10 U.S.C. § 1044e; 10 U.S.C. § 1565b.

[8] *See* Article 6b(e), UCMJ. *See also H.V.Z. v. United States*, 85 M.J. 8, No. 23-0250/AF, 2024 CAAF LEXIS 410, at *8 (C.A.A.F. July 18, 2024) ("Article 6b, UCMJ, guarantees certain rights to victims of UCMJ offenses and establishes procedures for the vindication of those rights.").

[9] *But cf.* Mil. R. Evid. 514. The victim advocate-victim privilege, *promulgated by the President*, may be claimed by an accused in appropriate circumstances. *See generally United States v. Harpole*, 77 M.J. 231, 234–36 (C.A.A.F. 2018).

[10] *H.V.Z.*, 85 M.J. 8, 2024 CAAF LEXIS 410, at *9 (citations omitted).

when it enacted Section 1044e in 2013 is that seven years earlier, the CAAF held:

> The current version of M.R.E. 305(e) does not require an investigator to notify an accused's or suspect's counsel prior to initiating an interview, regardless of whether the investigator knows or reasonably should know that the accused or suspect is represented by counsel on the offenses about which the investigator intends to question him. The *McOmber* notification rule and the subsequent codification of the rule in the Military Rules of Evidence were not constitutionally required under the Fifth or Sixth Amendments of the Constitution and are not consistent with the law set forth in [*Minnick v. Mississippi,* 498 U.S. 146 (1990)] and [*McNeil v. Wisconsin,* 501 U.S. 171 (1991)]. Thus, there is no constitutional requirement to provide an accused with more rights than those set out in the rules.[11]

Since then, Congress has taken no action to supplant *Finch* and codify *McOmber* in Article 27, UCMJ, the statute whose purpose *McOmber* sought to protect, or elsewhere. And if Congress has chosen not to do so with the right to counsel in the military under Article 27, UCMJ, we can safely interpret the absence of an exclusionary remedy in Section 1044e—establishing another, post-*Finch,* right to counsel in the military—as deliberate.[12] To be sure, Con-

---

[11] *Finch,* 64 M.J. at 125 (footnote omitted).

[12] *See United States v. Swift,* 53 M.J. 439, 448–51 (C.A.A.F. 2000) ("More than 40 years have passed since we observed in [*United States v. Price,* 23 C.M.R. 54 (C.M.A. 1957)] that the express language of Article 31 did not permit a false official statement prosecution to be based upon an unwarned statement. Congress has amended the U.C.M.J. numerous times since *Price* was decided in 1957, but none of the amendments has modified the clear limitations in Article 31(d). . . . [T]he requirement to provide specific rights' warnings in Article 31(b) and the restriction on use of statements obtained in violation of those rights in Article 31(d) represent decisions made by Congress, not this Court. In the more than 40 years since *Price* was decided -- including many years in which the Manual for Courts-Martial expressly prohibited use of unwarned statements in false statement prosecutions -- Congress took no action to create an exception to Article 31(d) for false statement cases arising under Article 107. Congressional inaction, in such circumstances, must be given great weight 'because the primary responsibility for overruling decisions on statutory construction is with Congress.'" (quoting *United States v. Gibson,* 43 M.J. 343, 346 (1995)).

gress knows how to dictate exclusion of statements obtained from servicemembers in violation of certain rights,[13] and Congress did not do so here.[14] Just as the CAAF in *H.V.Z.* abided by its "duty to refrain from reading a provision into Article 6b, UCMJ, when Congress has left it out,"[15] we must do the same in interpreting Section 1044e. Importantly also, in the decade since Section 1044e was enacted, the President has not updated Mil. R. Evid. 304 and 305 to level up Section 1044e's right to counsel with those of the Fifth and Sixth Amendments and the rights afforded by Article 31, UCMJ.

Speaking of the Fifth and Sixth Amendment rights to counsel, we know of course that those rights are waivable. Implicit in the majority and concurring opinions is that the Section 1044e right to counsel is non-waivable (or at least that it was not waived under these facts), thus declaring the right more ironclad than that of the Fifth and Sixth Amendments. Indeed, the Supreme Court has held that the Sixth Amendment right to counsel generally can be waived via the procedures laid out in *Miranda v. Arizona*,[16] which of course waive the Fifth Amendment right to counsel.[17] And if *Miranda* is generally sufficient to

---

[13] *See* Article 31(d), UCMJ ("No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.").

[14] *Cf. United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018) ("The UCMJ is a self-contained statute that both defines criminal offenses and promulgates the procedures by which those offenses are to be prosecuted and adjudicated. In it, Congress specifically provided for the court-martial of '[r]etired members of a regular component of the armed forces who are entitled to pay.' Article 2(a)(4), UCMJ. Congress also established mandatory sentences for some offenses (Article 106, UCMJ, 10 U.S.C. § 906 (2012)), and minimum punishments for others (Article 118(1)-(4), UCMJ, 10 U.S.C. § 918(1)-(4) (2012)), and authorized the President to set the maximum punishments for the remainder. Article 56, UCMJ. Had Congress intended to restrict the court-martial sentences adjudged in retiree cases, and particularly to abandon the principle of uniformity of treatment so essential to the UCMJ, one would expect it to have done so explicitly in either Article 2 or Article 56 of the UCMJ, not in some other statutory provision with no reference to its applicability to courts-martial. Congress has not done so.").

[15] *H.V.Z.*, 85 M.J. 8, 2024 CAAF LEXIS 410, at *10.

[16] 384 U.S. 436 (1966).

[17] *See Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda*, 384 U.S., at 479, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."); *Montejo v. Louisiana*, 556

apprise a suspect of and secure the waiver of both the Fifth and Sixth Amendment rights to counsel, surely it is sufficient to do the same with respect to whatever right to counsel, untethered to the Constitution, endured at that moment from Section 1044e and implementing regulations.[18] The implementing regulations cited in the majority and concurring opinions, while more directive than the statute, do not affect this waiver analysis, particularly since they are all silent on the matter (in addition to being silent on the matter of an exclusionary remedy).

The only reason to conclude otherwise is to "presume"—prophylactically— "that such a waiver is invalid under certain circumstances."[19] We look to Mil. R. Evid. 305, as the CAAF did in *Finch*, for any applicable presumptions of invalidity. Mil. R. Evid. 305(e)(3)(A) incorporates the "three layers of prophylaxis" from "the *Miranda-Edwards-Minnick* line of cases"[20] to protect the Fifth Amendment right to counsel. *Michigan v. Jackson*[21] "import[ed] the *Edwards* rule into the Sixth Amendment," and added "a fourth story of prophylaxis."[22] Although the Supreme Court overruled *Jackson* in *Montejo v. Louisiana*, the President deliberately chose to retain *Jackson*'s prophylaxis in Mil. R. Evid.

---

U.S. 778, 786 (2009) ("[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick [of waiving the defendant's Sixth Amendment right to counsel], even though the *Miranda* rights purportedly have their source in the Fifth Amendment . . . .").

[18] Special Agent Peters advised Appellant not only of her Article 31(b) rights, but of additional rights pursuant to *Miranda*. App. Ex. XII at 70, 88–91. The issue of custody, and thus the *requirement* to issue *Miranda* warnings, was not developed at trial.

[19] *Montejo*, 556 U.S. at 787.

[20] *Id.* at 794 "Under *Miranda*'s prophylactic protection of the right against compelled self-incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right. 384 U.S., at 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694. Under [*Edwards v. Arizona*'s] prophylactic protection of the *Miranda* right, once such a defendant 'has invoked his right to have counsel present,' interrogation must stop. 451 U.S., at 484, 101 S. Ct. 1880, 68 L. Ed. 2d 378. And under *Minnick*'s prophylactic protection of the *Edwards* right, no subsequent interrogation may take place until counsel is present, 'whether or not the accused has consulted with his attorney.' 498 U.S., at 153, 111 S. Ct. 486, 112 L. Ed. 2d 489." *Id.*

[21] 475 U.S. 625 (1986).

[22] *Montejo*, 556 U.S. at 799.

305(e)(3)(B).[23] Neither of those rules apply in this case. At the time of the interview, Appellant was not held in continuous custody after invoking a right to counsel, and charges had not been preferred against her. We should glean that this sort of multi-layered prophylaxis should be prescribed in rare instances that implicate *Constitutional* rights. Imposing a presumption of invalidity here, based on a statute or regulations that do not themselves provide for such, is unwarranted judicial paternalism.[24]

Rather than weighing whether the benefits of deterrence outweigh the costs to the truth-seeking process, the majority legislates a bright-line rule of suppression. In doing so, the majority resuscitates *McOmber*, an opinion that for all of its good intentions at the time in safeguarding the right to counsel under Article 27, UCMJ, had to be abandoned in *Finch* in order to keep pace

---

[23] *See Manual for Courts-Martial, United States* (2016 ed.), app. 22, Analysis of the Military Rules of Evidence at A22-19 ("In *Montejo*, the [Supreme] Court overruled its holding in *Michigan v. Jackson*, 475 U.S. 625 (1986), and found that a defendant's request for counsel at an arraignment or similar proceeding or an appointment of counsel by the court does not give rise to the presumption that a subsequent waiver by the defendant during a police-initiated interrogation is invalid. 556 U.S. at 798. In the military system, defense counsel is detailed to a court-martial. R.C.M. 501(b). The accused need not affirmatively request counsel. Under the Supreme Court's holding in *Montejo*, the detailing of defense counsel would not bar law enforcement from initiating an interrogation with the accused and seeking a waiver of the right to have counsel present. However, subsection (c)(3) provides more protection than the Supreme Court requires. Under this subsection, if an accused is represented by counsel, either detailed or retained, he or she may not be interrogated without the presence of counsel. This is true even if, during the interrogation, the accused waives his right to have counsel present. If charges have been preferred but counsel has not yet been detailed or retained, the accused may be interrogated if he voluntarily waives his right to have counsel present."). This again demonstrates the significance of the President's inaction in creating additional layers of prophylaxis in response to the enactment of 10 U.S.C. §1044e.

[24] *See generally Michigan v. Harvey*, 494 U.S. 344, 353 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be 'to imprison a man in his privileges and call it the Constitution.' This we decline to do." (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 280 (1942)).

with evolving Fifth and Sixth Amendment jurisprudence.[25] Now, still un-moored from the Constitution, the majority revives *McOmber*. But not *McOmber* for all accused. *McOmber* only for those accused who are also victims. But not all accused who are also victims. *McOmber* only for those accused who are also victims who are also represented by VLC *detailed* pursuant to Section 1044e. Those that retain civilian counsel are just as much out of luck as non-victim accused and are stuck with *Finch*.

If *McOmber* is unnecessary to protect the right to counsel under one stat-ute, Article 27, UCMJ, it cannot be deemed necessary to protect the right to counsel under another, Section 1044e. The majority finds a difference, though, in the form of a military specific rationale of combatting sexual assault in the military. For all its importance, that rationale is no more militarily specific than the importance of "assuring military defendants effective legal represen-tation without expense,"[26] and affording more protection "to servicemembers in the interrogation setting than to their civilian counterparts because of the characteristically coercive nature of the military,"[27] rationales implicitly found wanting in *Finch*.

The majority opinion also suffers from this quirk: Had NCIS simply waited a bit longer for the VLC to terminate his representation of Appellant—as he was endeavoring to do upon being notified that, with respect to his client's al-legations against PFC Hotel, the "case was closed" and a Sexual Assault Dis-position Report was pending[28]—there could be no conceivable statutory or reg-ulatory violation, and thus no constitutional due process violation. It follows that the process due to suspects still represented by detailed VLC differs from the process due to suspects who, *through no action on their part*, once were but are no longer represented by detailed VLC. This arbitrariness should be fatal.

It comes down to this: servicemembers who are suspected of an offense, including those suspects who are victims, must be advised of certain rights before questioning pursuant to Article 31, UCMJ. Special Agent Peters did that

---

[25] *Finch*, 64 M.J. at 124 ("*McOmber* represented an attempt to ensure that the statutory right to counsel under Article 27, UCMJ, was administered in a manner con-sistent with then-current Supreme Court constitutional precedent regarding the right to counsel. *Minnick* and *McNeil* subsequently modified that precedent. In the absence of a distinct military rationale justifying its continued application in light of these changes, *McOmber* is overruled. M.R.E. 305(e) remains controlling authority.").

[26] *McOmber*, 1 M.J. at 383.

[27] *Finch*, 64 M.J. at 129 (Gierke, C.J., concurring in part and dissenting in part).

[28] Appellee's Resp. to Court Order to Produce Victim's Legal Counsel Decl., app'x B, encl. A.

and more in this case, advising Appellant of a right to consult with a lawyer before questioning and to have her appointed military lawyer present, all of which she voluntarily, knowingly, and intelligently waived. We should, as the military judge did, give effect to that waiver. There is no reason to presume it to be invalid. Though the military judge did not specifically address the effect, if any, of Section 1044e, he did not abuse his discretion in ruling that Appellant's statements were given voluntarily. The statute and implementing regulations provide no basis for relief for an *accused*. I would affirm the findings and sentence.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court